**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

I, Special Agent Casey T. MacDonald, being first duly sworn, state under oath as follows:

Preface

1. The following affidavit is furnished to support a search warrant for (1) the premises of 533 Broadway, Lawrence, Massachusetts, the place of business of "Fellaz Barber Shop" and (2) a silver 2000 Mazda minivan with Massachusetts registration 2VZ227, vehicle identification number JM3LW28G8Y0151468, registered to Maria Ozuna-Osorio ("the silver Mazda"). A detailed property description of each location is contained in Attachment A. Based on the facts and circumstances contained in this affidavit, I submit that there is probable cause to believe that Santos Guerrero Morillo a/k/a Pedro Oscar ROJAS ("ROJAS"), Alberto Guerrero Marte ("GUERRERO"), Michell DeJesus ("DEJESUS"), Allan Raymond Pimentel ("PIMENTEL"), and FNU LNU a/k/a "Wilkins Bertre" a/k/a "Barbero" ("BARBERO") and others known and unknown are engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances). A federal Grand Jury in the District of New Hampshire has returned an Indictment charging these individuals and others with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, given the Grand Jury's finding of probable cause, this affidavit will present an overview of the investigation and allegations with respect to these individuals but will primarily focus on the facts giving probable cause to support the issuance of search warrants for the Fellaz Barber Shop, a Lawrence, MA Barbershop, and a silver Mazda, which is used by a drug dealer named BARBERO. As set forth below, investigators have determined that GUERRERO (through

intermediaries) has distributed narcotics to BARBERO at the Fellaz Barbershop and that BARBERO, in turn, has distributed narcotics to his customers inside the Silver Mazda. Law enforcement officers have observed the silver Mazda parked in the area of 19 Jordan Street in Lawrence, Massachusetts early in the morning on more than one occasion as recently as October 6, 2016 and believe that it therefore may be parked in that area overnight.

## Introduction

2.  I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been employed as a Special Agent with the DEA since May of 2014. I graduated from the DEA Special Agent Academy, where I was trained in drug investigations, narcotic identification, search warrants, undercover techniques, surveillance, debriefing of informants and other investigative procedures. I am currently assigned to the Southern New Hampshire Drug Enforcement Administration's High Intensity Drug Trafficking Area Task Force ("HIDTA TF") as a Special Agent ("SA"). Prior to joining the DEA, I spent four years as an Officer with the United States Secret Service. I hold a Master's degree in Criminal Justice from the University of Massachusetts. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. § 841(a)(1). Since joining the DEA, I have participated in three wiretap investigations and several other investigations where I analyzed telephone toll records and subscriber information.

3.  Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.1 Based upon

---

1 Observations made and conclusions drawn throughout this declaration that are based on my training and

my training, experience, and involvement in prior investigations, I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers. Because individuals who are involved in the distribution of controlled substances are highly cognizant of the presence of law enforcement, and often engage in counter-surveillance maneuvers while traveling in a motor vehicle, it is frequently difficult for law enforcement to effectively conduct surveillance. The presence of a tracking device on a motor vehicle that is being utilized for the distribution of controlled substances is beneficial because it allows law enforcement to track the movement of the vehicle effectively and to decrease the chance of detection.

4. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of search warrants, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

---

experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

Investigation Overview

5.  Based upon information obtained from a variety of sources, including confidential sources, GPS tracking devices, cell phone location information, physical surveillance, intercepted communications, and controlled purchases of narcotics, I believe that ROJAS, GUERRERO, DEJESUS, PIMENTEL, BARBERO, and others are actively involved in the distribution of kilogram-quantities of heroin and fentanyl in Massachusetts and Southern New Hampshire.

6.  A law enforcement investigation that began in the spring of 2015 has led me to identify a family-run drug trafficking organization ("ROJAS DTO") led by ROJAS who co-conspirators call "Elvin" and who is currently in the Dominican Republic. ROJAS and GUERRERO are brothers who sell drugs around the Lawrence, Massachusetts area. ROJAS traveled to the Dominican Republic in 2015 and left GUERRERO in charge of the DTO's distribution activities in New England. I believe that ROJAS is still involved in directing the activities of the DTO, including arranging for the acquisition of quantities of drugs and directing the distribution of drugs by other members of the DTO. GUERRERO also arranges for the acquisition of drugs and directs the operation of stash houses and of retail distributors. DEJESUS, GUERRERO's girlfriend, is responsible for taking orders from drug customers, coordinating activities of the DTO, making deposits into bank accounts on behalf of other members of the DTO, and assisting in the retail distribution of drugs. PIMENTEL is a retail-level drug distributor who runs the DTO's stash house, packages drugs, and transfers drugs and money for GUERRERO.

7. On or about August 17, 2016, Judge Steven J. McAuliffe of the District of New Hampshire issued an order authorizing the initial interception of wire and electronic communications over (646) 716-2545 ("Target Telephone #5") and the continued interception of wire and electronic communications over two other numbers used by GUERRERO and DEJESUS. This authorization was renewed on September 15, 2016. GUERRERO is the primary user of Target Telephone #5. Intercepted calls indicate that on a daily basis, DEJESUS receives calls from customers and GUERRERO then calls drug runners to dispatch them to various locations in Lawrence, Haverhill, and Methuen, Massachusetts to meet customers. GUERRERO also sells larger quantities of heroin to other distributors.

8. Intercepted conversations have been in both Spanish and English. Descriptions of intercepted conversations that are discussed in this affidavit are based upon draft summaries of intercepted conversations and may not be word-for-word translations or transcriptions. Additionally, the identity of callers discussed in this affidavit are tentative and based upon information known to law enforcement at this time.

## Probable Cause

9. As set forth below, investigators believe that GUERRERO supplies narcotics to a barber that has been identified as "Barbero." BARBERO works at, and is associated with, the Fellaz Barbersop, which is the subject of this search warrant. Intercepted calls and surveillance have indicated that GUERRERO (through "runners" he has dispatched) has delivered narcotics to BARBERO at the Fellaz Barbershop. Further, investigators have observed what appear to be drug deals between BARBERO and other customers in BARBERO's silver Mazda, which is also the subject of this search warrant.

10. As an initial matter, investigators have intercepted numerous calls between GUERRERO and an individual he calls "Barbero." BARBERO uses telephone number (978) 327-2141. Based upon these interceptions, I believe that GUERRERO and BARBERO are drug trafficking associates. On some occasions, GUERRERO has supplied BARBERO with drugs but on other occasions, I believe BARBERO may have supplied GUERRERO. For example, on June 29, 2016, BARBERO told GUERRERO he would like "50 of the cut and the 100 pesos." I believe, based on my training and experience and familiarity with code words used by members of this DTO, that "cut" refers to a cutting agent used to dilute drugs and "pesos" may refer to a quantity of drugs. On August 31, 2016, BARBERO told GUERRERO that he has "a guy there that wants me to give him something of the brown. How is the brown that you got there?" GUERRERO told him that it was good, and discussed how he was cutting it. BARBERO said he "wanted you to find me five and the side there," the side presumably referring to cut. BARBERO said he has "a lot, but of the other man" meaning, I believe, that he had a lot of another type of drug.

11. I believe that BARBERO may have assisted GUERRERO in purchasing oxycodone pills on at least one occasion. Beginning on August 22, 2016 GUERRERO made various calls asking different associates whether they could supply him with oxycodone pills, referring to them as "M30s" which I know to stand for 30 milligram pills or "buttons" which I know to be a common slang for such pills. On August 28, 2016, at 9:17 p.m., GUERRERO called BARBERO about the pills:

GUERRERO: Remember what I told you.
BARBERO: What?
GUERRERO: About the buttons I spoke to you today.

| | |
|---|---|
| BARBERO: | Oh yeah I was told those would be available for tomorrow. |
| GUERRERO: | Well then you tell me when it's ready and I will swing by and deal that. |
| BARBERO: | How much will she want? |
| GUERRERO: | She said she wanted two. |
| BARBERO: | Alright tomorrow we can get her that. |
| GUERRERO: | She told me from a thousand to two, a thousand to two thousand. and I told her alright let me see [Voices Overlap]. |
| BARBERO: | Tomorrow. |

12.   Intercepted calls and surveillance have allowed law enforcement to tentatively identify BARBERO, which confirms that he works at the Fellaz Barbershop, which is the subject of this search warrant. As an example, on July 1, 2016, law enforcement officers conducted surveillance of DEJESUS (GUERRERO's girlfriend) as she delivered something to BARBERO. At 3:42 p.m., the following conversation ensued:

| | |
|---|---|
| GUERRERO: | My wife is there. |
| BARBERO: | Man, I had to leave to my house to take care of a customer. |
| GUERRERO: | Oh my God, she is in front of the barbershop. |
| BARBERO: | She's in front? Can't she leave it there? So I can call a guy to put it away for me. |
| GUERRERO: | Well, if you tell me, I can leave it. |
| BARBERO: | Yes, I will send for it. Is she right in front? |
| GUERRERO: | Yes, she is there by the door. |
| BARBERO: | … we'll figure out the money. |
| GUERRERO: | Huh? |

BARBERO:    We'll figure out the money later then, or when we see each other.

13. BARBERO told GUERRERO that he was going to send "a Puerto Rican, one of those there" out to meet DEJESUS and that "he knows her." GUERRERO then called DEJESUS and told her, "he's going to send someone, he knows you. He's going to send one of the guys that works there." Law enforcement officers conducting surveillance observed an unidentified male ("UM #1") walk out of Fellaz Barber Shop and approach DEJESUS's vehicle. UM #1 then reached inside and took a package that resembled a large wallet and returned to the barber shop. Undercover law enforcement officers then entered the barber shop to get a haircut. A few minutes later, an individual later identified as BARBERO returned to the shop and UM #1 handed BARBERO the package he took from DEJESUS's vehicle.

14. On September 30, 2016, at approximately 11:09 a.m., BARBERO called GUERRERO and asked if he had "two fingers" that he could bring to the barber shop quickly. A "finger" generally refers to 10 grams of heroin or fentanyl. GUERRERO said he would send his "guy," which, I believe, meant a drug courier. Approximately one minute later, GUERRERO called PIMENTEL and told him to bring "two little candles" to BARBERO. PIMENTEL agreed. At approximately 11:22 a.m., an undercover officer ("UC") entered the barber shop. At 11:25 a.m., a different law enforcement officer placed a phone call to (978) 327-2141 the number used by BARBERO. The UC watched the same barber who was the ultimate recipient of the package from DEJESUS answer the phone. This allowed law enforcement to confirm the identity of the barber holding the phone used by BARBERO. The UC asked BARBERO for a business card. BARBERO gave him a Fellaz Barber Shop business card with the address of 533 Broadway and the name "Wilkins" handwritten on the card. It also contained a phone number (978) 893-9388 which is not

the same number used by BARBERO to speak to GUERRERO. However, when the telephone number on the business card was searched in Facebook, the profile of Wilkins Bertre is associated with the phone number. The photograph on Facebook for "Wilkins Bertre" is that of BARBERO, which confirms that "Wilkins Bertre" is a name used by BARBERO.

15.     At approximately 11:45 a.m. that day, BARBERO called GUERRERO and asked "what happened?" apparently asking why PIMENTEL had not arrived with the drugs. At 11:48 a.m., two white males and a tall Hispanic male ("UM #2") arrived in the area in a landscaping truck with New Hampshire license plates and entered the barber shop. At 11:52 a.m., the two white males left the barber shop and UM #2 stayed standing just outside the shop. At 12:10 p.m., GUERRERO called BARBERO and told him that "his guy" was almost there. BARBERO complained, "I have these people waiting," referring, I believe, to the men who had arrived in the landscaping truck, At 12:19 p.m., PIMENTEL entered Fellaz Barber Shop. I believe that PIMENTEL entered the Barber shop to deliver the narcotics to BARBERO.

16.     At 12:25 p.m., BARBERO left the shop and walked with UM #2 to the silver Mazda. BARBERO entered the driver's seat and UM #2 entered the passenger's seat. BARBERO drove the van approximately 200 feet and pulled over in a parking lot, circled the lot and turned back toward the barber shop. UM #2 then left the silver Mazda and entered the landscaping truck with New Hampshire plates. BARBERO drove back to the barber shop, got out of the van and returned to Fellaz Barber Shop. The landscaping truck left the area and law enforcement agents followed it to Manchester, New Hampshire.

17.     The landscaping truck was subsequently pulled over by the Manchester Police Department. All three individuals observed in Lawrence were in the vehicle. Manchester officers

ultimately recovered three fingers, approximately 30 grams of suspected heroin from the vehicle. The substance field-tested positive for opiates.

18. Based on these observations and on my training and experience, I believe that PIMENTEL delivered drugs to BARBERO inside the Fellaz Barber shop on September 30, 2016. I believe that BARBERO then conducted an exchange of drugs with UM #2 inside the silver Mazda. I further believe that on July 1, 2016, DEJESUS also delivered a drug-related package to BARBERO at the barber shop. Another barber shop employee, UM #1, took the package and held it for BARBERO, giving it to him inside the barber shop shortly thereafter.

## Training and Experience

19. Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I know that individuals involved in the sales of controlled substances often do business in cash and often use businesses to launder these cash proceeds.

20. Based on my training and experience, and my participation in this investigation and other investigations involving individuals engaged in drug trafficking and/or money laundering, I know that individuals and/or businesses engaged in financial crimes often maintain documents and financial records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. I am also aware that it is generally a common practice for drug traffickers to maintain detailed records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid

and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep records to show balances due for drugs sold in the past and for payments expected as to the trafficker's supplier and the trafficker's dealer(s). Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. The records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence

21. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. They may store these client lists and financial documents digitally on computers, disks, CDs, DVDs, thumb drives, and other objects capable of storing digital data.

22. It is also a generally common practice for traffickers to conceal large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled

substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences or businesses.

23. Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and US currency are often located in a business, residence, or on an individual's person. Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones or computers.

24. Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

25. It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

Conclusion

26. Based on the information in this Affidavit, I submit that there is probable cause to believe that evidence of conspiracy to distribute, distribution, and possession with intent to distribute controlled substances including heroin, a Schedule I controlled substance, in violation of federal laws, including 21 U.S.C. §§ 846 and 841(a)(1) may be found in the subject premises and within the vehicle. Based upon my training and experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their homes, automobiles, or in other places under their control and that those items are evidence of violations of the offenses being committed by GUERRERO, BARBERO, and others. Accordingly, I request that this Honorable Court issue a search warrant for the locations described in Attachment A.

_____
CASEY T. MACDONALD
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn and subscribed to before me this 7th day of October, 2016, at Boston, Massachusetts.

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS